## JOHN WILSON, plaintiff in error, *v.* THE PEOPLE, defendants in error.

To constitute the offence of murder under the first subdivision of the fifth section of the statute, entitled " Of crimes punishable with death " (2 *R. S.*, 657), an actual intention to kill must in all cases be proved. Without such an intention, the act can be no more than manslaughter.

Such intention may be inferred from the circumstances under which the violence was inflicted, and sometimes from the act itself; but the *onus* of establishing it rests upon the prosecution.

The "heat of passion " mentioned in the statutory definition of manslaughter, affords the intended protection to the accused, whether it was produced by acts or words, if the provocation was such as was naturally calculated to produce it.

On a trial for murder by violence, it is not competent for physicians, who made the *post-mortem* examination, after having described the appearance of the wound to the jury, to give their opinions in evidence as to the kind of instrument by which the wound was caused.

On a motion before the Court of Oyer and Terminer, in behalf of the prisoner, for a new trial, on the ground of irregularity, affidavits of counsel, as to information they have received from jurors concerning what took place in the jury room, cannot be received as any evidence of the alleged irregularity.

It is no reason for setting aside a conviction for murder, on motion for a new trial, that during a recess of the trial, one of the jurors took up and examined a piece of the skull of the person alleged to have been murdered, which was lying on the District Attorney's table, the circumstances of the case being such as to show that the juror could not have been misled thereby, and the fact of the juror having examined the said skull being known to the prisoner's counsel before they entered upon the defence.

Affidavits of jurors cannot be received to show that, at the request of one of their number, a constable handed him a paper, on which were marked the several punishments fixed by law for the different degrees of manslaughter.

And when such fact was shown by the affidavit of the constable, the court refused to set aside the verdict, it appearing affirmatively that the jury could not have been misled thereby.

Sentence of the prisoner on a conviction for murder.

THIS was a writ of error to the Court of Oyer and Terminer of Albany county. The prisoner had been indicted for the murder of Patrick McCarty, and pleaded not guilty. He was tried before Mr. Justice Gould and the justices of the Sessions,

at a term of the Oyer and Terminer, commencing on the 15th of February, 1859.

The District Attorney upon the trial called as a witness, on the part of the People, *Dexter Potter*, who testified : I reside at Ticonderoga; in October, 1858, I was engaged in boating, from Port Henry along the Northern canal; was captain of the boat "P. M. Baker;" knew Patrick McCarty; he was a hand on my boat on 20th of October last; on the morning of October 20th, 1858, my boat lay about her length below the railroad bridge at West Troy, in the town of Watervliet, in the county of Albany; the Armenia of Crown Point, another boat, was there also; one boat lay with her stern under the railroad bridge; I can't call the name; a western boat came down and was snubbed to that boat; of this boat I heard the name, but do not recollect it; I had known prisoner; I believe he was a hand on one of these two last boats; on the morning of October 20th, 1858, I saw Patrick McCarty on my boat alive, at West Troy; the next that I saw him was, as near as I can judge, about three hours after that; we fished him out of the canal; he was pronounced dead; I there saw a cut on the back side of his head; I heard the cry of "a man overboard;" I saw Wilson, standing on the dock; think prisoner is the man, Wilson, I then saw there; at the time I saw McCarty on the bow of my boat, I stepped on to the dock off my boat to go and clear up the tow line of my boat from the deck of the western boat; I was then some eighty or ninety feet from my boat; I went no further off; I heard some words pass between a man on the western boat and Captain Belden; I did not see the man; I remained five or ten minutes under the railroad bridge, when I heard the cry of "man overboard;" I ran back to my boat; saw a hat in the water floating with current near the stern of my boat; a black hat; I thought a Kossuth hat; I saw no body arise from the water; have seen this hatchet before. (Hatchet was here shown to witness.) It was on my boat before this occurrence for a month; might have been longer.

The evidence in regard to the hatchet was objected to, as irrelevant and immaterial. The objection was overruled by the court, and defendant's counsel excepted.

While I was near the railroad bridge, I heard a conversation between McCarty and a man on the western boat; it was a moonlight night, with a little fog in the morning; it was between two and three o'clock in the morning, McCarty had been seven or eight days on my boat.

The same witness, upon *cross-examination*, testified: I have known McCarty about twelve years; he was from 35 to 38 years old; he had worked on the canal and at grocery tending; did so for Mr. Quinn; he kept assortment; sold liquors; the last I saw of McCarty he was standing on the bow of my boat; bow was to the north; current runs south; the western boat was north of mine; the hat was floating between my boat and the dock; there was twelve or thirteen feet space between the two; found no one on my boat when I got on it; as I got on to my boat, I passed a man standing on the dock; I took him to be Wilson; I recollect seeing but one man there · others came from the bridge right behind me; I saw no one there; might or might not have seen any one else, if there.

*Oliver Ormsby* testified: I reside at Ticonderoga; I was at West Troy, October 20th, 1858; was a boatman; was then just below railroad bridge; I was a hand on the boat Armenia; knew Patrick McCarty; saw him on the bow of Potter's boat, the "P. M. Baker," at West Troy, in the town of Watervliet; I was on the dock, thirteen or fourteen feet from McCarty; after that I saw him after he was taken out of the water; there were four boats there, two northern; I did not before that know Wilson; can't say as to my seeing him that morning; after seeing McCarty on the bow of the boat, I went forward with Potter to clear the line; went eighty or ninety feet forward; while there, heard conversation between McCarty and some one on the western boat that came down and snubbed alongside of boat that lay ahead of us; there were two western boats, one going north and one going south; the conversation came from the latter (the one coming from the west); I don't know which

boat Wilson was a hand aboard; I heard some one on that boat call McCarty "a whisky head," and McCarty returned the compliment; I heard them dare each other ashore, or say they would like to have each other ashore; I heard some one on the western boat speak to Captain Belden; he was captain of the Armenia; nearly ten minutes, five or ten minutes after that I heard the cry of "man overboard;" I ran back to stern of Armenia; I saw a man there; I can't say who he was; I think I saw that man the next morning down at a grocery north of the weigh lock; they called him Wilson; this (prisoner) is the man; I saw McCarty after he was taken out of the water; observed a wound on him near the top of his head, along by his back; it was a moonlight night.

The same witness, upon *cross-examination*, testified: Can't say that I heard all that passed between the man of the western boat and McCarty; I think it did not last till the cry of "man overboard;" can't tell who the man on the western boat, jawing with McCarty, was; threats of fighting passed between them three or four times; the man I passed on the dock I did not then know; I saw him distinctly enough to know him if I saw him again; I was within two or three feet of him; I next saw that man at the grocery, and that man was the prisoner; I went to assist in looking for McCarty; others came up behind me; this was at two or three o'clock, A. M.; moonlight; a very little foggy; can't say whether a full moon; it was clear, except the fog; could distinguish a man's features nearly fifteen feet; it was three hours before the body was found; it was a half or three-quarters of an hour after the body was found that I saw prisoner at the grocery; think they had arrested him; had not seen him till then, after I saw him, as I thought, on the dock; can't say whether the man I saw on the dock went with us to search for the man overboard; I don't remember his going; the cry of "man overboard" came from the stern of our boat; saw no one there but the man on the dock.

*Theodore Belden* testified: I was at West Troy, October 20th, 1858; was boating; was captain of the Armenia; I knew

McCarty; saw him that morning above the weigh lock, this side of the railroad bridge; he was on the dock the first time I saw him; the next time I saw him he was on the bow of the P. M. Baker; last saw him when taken out of the water; I did not then know Wilson; I saw him that afternoon after he was arrested; I heard a conversation between McCarty and some one on a western boat that came down from the west and snubbed; think it was Louis' boat; the conversation was a quarrelling one; the man on the western boat called McCarty "a whisky head;" next thing I heard was the cry of "man over-board;" this was five or ten minutes after conversation; the conversation had ceased before I heard the cry of "man over-board;" when I heard this cry I was on the bow of my boat; I ran back to the stern; when I got there, three or four were there ahead of me; we went to looking for Mr. McCarty, as he was not there; Potter, Ormsby, I and a man off the western boat searched; the last man got there after I did; we found nothing of McCarty; we called him by name; neither found him nor heard anything of him; about seven, or between six and seven o'clock, A. M., we found McCarty near where the boats lay at the time we commenced looking for him; I discovered a wound on his head.

The same witness, upon *cross-examination*, testified: When I heard the quarrel I was on the bow of my boat; can't say how far from Ormsby; fifteen feet, I should think; twenty or thirty feet from the man on the western boat, and forty or fifty from McCarty; can't say whether Ormsby took his coat off to fight or not; I was engaged, and did not pay much attention to what was said during the quarrel; as soon as I heard the cry of a "man overboard," I went to work to help find the man; there was a man on shore attending on the stern line; a man from the western boat came down after I did, and assisted in searching; I saw but one man on the western boat, and one ashore with the line; the man that was tending the stern line of the western boat, was one that came down behind me; the man that came down behind me from towards the western boat, to search for the body, was not the prisoner; the alarm was

given from the stern of my boat, or the dock by it; I had some words with a man on the western boat.

*Spencer Bitgood* testified: I am a boatman; was in October, 1855; was at West Troy on October 20, 1858; had charge of the "H. Pease," of Rome; was going west; was there between two and three o'clock, A. M.; was there when the other western boat came down; she got there between two and three o'clock, and snubbed on the middle cleet of my boat; this boat was named "John Van Antwerp;" the morning was moonlight; I could read the Van Antwerp's name on her; she snubbed at three o'clock, A. M.; when I came on deck there was a man on my deck holding fast the stern line of the Van Antwerp, I went up to him and commenced conversation with him; I had seen him before; his name was Galligan; some quarrelling was going on; I saw a line taken from the bow of Van Antwerp, across one of the northern boats (or the way they lay across both), and passed to some one on shore; can't tell who it was took the line across; heard quarrelling below; I went to stern of my boat, and saw two men stand on the dock opposite the stern of the northern boat that lay next to the dock; then I saw two men near the stern of my boat trying to clear some lines, and then in a minute or two, or may be five, I heard some halloo "man overboard;" Gilligan jumped off; I jumped off behind; the man of northern boat ran ahead of us; when I got down there a man stood on the dock, and said, "we were a damned smart lot of captains to let a man fall overboard and drown;" I saw the man who said this the next morning where the corpse was; he was the prisoner; I saw McCarty when found; saw the wound.

The same witness, upon *cross-examination*, testified: My boat lay next to dock, heading west or north; the "Van Antwerp" lay outside of me, heading the other way; the man on the bow of the northern boat outside was trying to get his boat into dock; I saw two men on dock; I saw three men then, one on bow of northern boat; the jawing stopped five or ten minutes; there was no jawing when I heard the cry of "man overboard;" when I heard this cry, I was not looking that way; I

supposed the fuss was over; Gilligan and I and two captains then searched for the missing man; think I did not notice Wilson there after the remark he made; I did not stay during all the search; I was six or eight feet from letters on "Van Antwerp;" could have read them, and great deal further; it was very light; had been foggy; fog cleared off.

*John Gilligan* testified: On October 20th, 1858, was a hand on "J. Van Antwerp;" had come from Buffalo; we got to West Troy; Martin Kiley, John Wilson, the prisoner, and I and Conradt Vettick and a boy, were on that boat; Vettick acted as captain of the "Van Antwerp;" she got there about three o'clock, A. M.; she snubbed along side of the "H. Pease;" we had both lines out on her, then Kiley and Wilson got the bow line ashore; then they had words with captains and hands of the northern boats; I heard Wilson call McCarty "a whisky head;" I knew McCarty; saw McCarty taken from the water.

The same witness, upon *cross-examination*, testified: Kiley and Wilson put the bow line across the bow of the boat next the dock—the Armenia; not the one where McCarty was; heard McCarty say he wanted to lick some monkey that was on board that boat "Van Antwerp;" I heard no reply to that; don't know whom McCarty meant; I went ashore to see about lines; Kiley and Wilson let the line go; I met McCarty on the Armenia; spoke to him; he went back to his own boat, and I went to "H. Pease" to take care of my line; don't know where Wilson then was; Kiley was by the snubbing post; I stayed on "H. Pease" a very few minutes; I heard Wilson halloo "there is a man overboard;" I jumped off and went down; I don't know where Wilson was when he halloed; I did not see Wilson down there when I first went down; I saw Potter and Ormsby in half a minute after I got there; I saw Wilson with a pole in his hand looking for McCarty; I remained there fifteen or twenty minutes; Wilson stayed there as long as I did; Potter had the pole; Wilson and I went down to side cut together; were there fifteen or twenty minutes and then went back to the boat; Wilson was arrested about nine A. M.; he had remained about there until he was

arrested; don't know where Wilson was at the time the body was found; Wilson had been on duty all night.

*Conradt Vettick* testified: In October, 1858, I was boating on the boat "John Van Antwerp;" hands were John Wilson, the prisoner, Martin Kiley, John Gilligan; I was captain sometimes; boat came there from Buffalo; arrived at West Troy at three o'clock, A. M., October 20th, 1858; I stood on the dock when the boat was snubbed; John Wilson halloed; he wanted to come in close to the dock; then McCarty said he wanted to go out; Wilson said: "Shut up your damned whisky head;" I did not hear McCarty say a word; then John Wilson jumped off our boat and jumped on to the northern boat, and from that boat on the next; then he jumped on the heel-path of the canal (dock); then he walked a couple of steps back again, up and down heel-path; then he went on the northern boat again; he picked something up; I can't tell whether it was an ax or a hatchet, and he struck McCarty on the back part of his head, so (explaining manner), with the ax or hatchet; McCarty stood with his back to him (Wilson); he struck him with great force; as he struck, McCarty fell overboard into the canal and water; then Wilson took a pole and put it into the water, and seemed to have liked to have got him out; when he could not get him out he halloed, "here's your man fell overboard;" Wilson stood still there as long as I saw him; McCarty was about 25 or 26 years old, I should think; I stood on the heel-path when I saw Wilson do this; I was fifteen or twenty feet from Wilson when he struck; I could hear the blow; think McCarty did not see Wilson come on the boat, nor behind him, and had no words or altercation with Wilson, the prisoner.

The same witness, upon *cross-examination*, testified: I was then about five feet from the edge of the canal, and fifteen or twenty feet from the place where Wilson struck McCarty; as Wilson came on to the heel-path, he could have seen my face and I his; he and McCarty had no words at that time, as I heard; I was afraid if I went there I would be knocked in too; I went away with driver, with team; I then said to Kiley, "Wilson knocked him off, and he'd be drowned, it was too

bad ," one of them said, " Say nothing about it, he'll be hanged if you do;" I am sure the weapon was an ax or hatchet; I think it was about three feet long, two or three inches wide; Wilson picked it up on the boat; I heard Wilson step on the boat, going up to McCarty; he stepped quick, walked as fast as he could; when he had struck, he dropped the weapon on the boat and took the pole; I remained there till men got there; I went away right off, before they had begun to search; McCarty stood on the boat next to the dock, at the stern; boat lay along the dock; McCarty fell between the two boats; saw his hat float.

*Re-examined* by People: I am a Dutchman, or German; I am twenty-five years old; seven years in this country.

*John P. Witbeck* testified; I am a physician and surgeon; reside at West Troy, town of Watervliet, Albany county, and am one of the coroners of this county; I saw the body of Patrick McCarty on the morning of October 20th, 1858, in the water of the canal, just above the weigh lock at West Troy; he was dead; tied to the dock; I had him taken out of the water; I found a cut on one side of the back part of the head (the right side), externally bruised and torn; the skull, about one and half inches in length, and three-quarters of an inch in width, was driven in just the thickness of the bone, so that the bone was pressed in; the bone was not detached; only one blow was given; such a blow would cause a man to become insensible; would produce concussion of the brain; he was thereby, in my opinion, rendered insensible, so that he could not help himself, and he drowned in the water in the canal; the effect of such a blow itself might be death, not instantly.

The District Attorney here put to the witness the following question:

From your examination of the wound you have described, what kind of an instrument was it caused by, in your opinion?

Question objected to by prisoner's counsel, as not being the subject matter of an opinion. Objection overruled by the court, and prisoner's counsel excepted.

*A.* That wound, in my opinion, was caused by a blow from some blunt instrument.

The same witness, upon *cross-examination*, testified : Such an injury could be produced by a fall from a great distance, on just such an instrument as would produce it by a blow; I know nothing from which to come, to the conclusion in this case, that the wound was produced by a fall; in a majority of cases of such wounds on the skull as this, by good medical treatment the patients do recover.

*Le Roy McLean* testified: I am a physician and surgeon at West Troy; I assisted at the *post-mortem* examination of McCarty ; examined his head ; heard Dr. Witbeck's testimony ; I found an incision wound upon the head one and a half or two inches in length ; a portion of the skull was driven in ; I suppose he was rendered senseless by the blow, and then drowned.

*Q.* From your examination of the wound which you have described, what, in your opinion, was the wound caused by ?

Objected to as above ; overruled ; exception taken.

*A.* I think it was caused by some blunt instrument, like the head of an ax or hammer.

The same witness, upon *cross-examination*, testified : The membrane inside was not ruptured ; the blow would not produce death immediately ; under proper treatment, a fracture of the kind might present a fair case to recover; persons do frequently recover from such a wound.

*William Edgerly*, testified : I live in Moriah, Essex county ; I know prisoner ; saw him in jail in November last; can't tell exact time ; had a little conversation with him.

The prisoner's counsel here desired to know what the District Attorney intended to prove by this witness.

The District Attorney here offered to show that the prisoner stated to the witness at that time, in substance or effect, that all he could do was to get the Dutchman out of the way ; that the Dutchman had not given bail for his appearance.

Objected to by prisoner's counsel as irrelevant, immaterial and improper. Objection overruled, and excepted to by prisoner's counsel.

Wilson *v.* The People.

The witness then testified: I told him I was sorry to see him locked up, and I should like to help him if I could; he said he did not know as I could help him any; he said all I could do was to get the Dutchman out of the way; he said the Dutchman had not given bail for his appearance at court; I was subpenaed to come here.

The prisoner's counsel here moved to strike out the testimony objected to, on same grounds as he objected. Motion refused, and prisoner excepted to refusal.

*Duniel McCormick* testified: I live at Ticonderoga; I am not aquainted with the prisoner; saw him in jail in November, at the time spoken of by the last witness; went with Edgerly; heard the conversation; it was as given by him (Edgerly).

The same objection here taken as with last witness, by the prisoner's counsel. Overruled, and exception taken.

*Marietta Dotty* testified: I was on board the boat of Captain Potter last fall; I recollect the time of the occurrence; I was on the boat the day before; this hatchet was then on board.

The same witness, upon *cross-examination*, testified: The boat was named "P. M. Baker;" about 6 A. M. Armenia was ahead, and Baker at the dock; this hatchet was sometimes lying on top of the boat, sometimes in the cabin; that night this was by the water barrel near the cabin door, at the stern of the boat; it lay there all the day before; McCarty used it to work with in the afternoon of the day before; next morning I saw it on the deck load of the boat, right hand side, four feet from the cabin door.

The prosecution here rested.

After some evidence had been given on the part of the defence, and counsel on both sides had addressed the jury, the judge charged the jury.

The presiding judge, among other things, stated to the jury, that it was not claimed by the prisoner's counsel that the defendant could be convicted of either manslaughter in the first or second degrees, but that if he was guilty of any crime, it was either murder, or manslaughter in the third degree; and

after such statement, explained to the jury the meaning of the statutory provisions of murder and of manslaughter in the different degrees, and among other things charged the jury, that should a man stand on the edge of a dock, and another push him into the river, the pusher is not entitled to say to the other, you must swim; if he be drowned, such act is murder, unless explained away by evidence on the circumstances attending the transaction, for the law presumes that a man intends the consequences of his acts, unless otherwise explained. To which charging the prisoner's counsel excepted.

The judge further charged the jury, that if the natural consequences of the blow is to precipitate the man into the water, and he drown, such act is murder, unless explained away by evidence or circumstances attending the transaction. To which the prisoner's counsel excepted.

Said judge further charged, that if two men stood at the top of a high tower or monument, and one pushed the other off, and he is killed by the fall, it is murder, unless explained as before stated. To which the prisoner's counsel also excepted.

And the judge further charged the jury (as to manslaughter in the third degree), that the heat of passion means a quarrel, an altercation, in which the party killed is immediately concerned; that is, that the heat of passion must not be all one side; there must be sufficient cause for it. To which the prisoner's counsel also excepted.

On the 17th day of February, 1859, at 11 A. M., the jury came into court and asked whether they could find a verdict in any other form than guilty or not guilty, and the presiding judge answered such inquiries.

And further charged the jury, among other things, in these words: "It is questionable whether words even of the most aggravated character, would be allowed in law to produce the 'heat of passion,' meant by the statute, which would reduce the grade of the offence." To which the prisoner's counsel excepted.

The jury found the prisoner guilty of murder.

A motion for a new trial, on the ground of alleged irregularities, was then made on affidavits, and argued by

*J. M. Kimball* and *Henry Smith*, for the prisoner, and·

*S. G. Courtney* (District Attorney), for the People.

After consideration, the following opinion was delivered by

GOULD, J. The affidavits of Mr. Smith and Mr. Kimball, as to *information* from jurors concerning what took place in the jury room, are utterly inadmissible. They are far worse in principle than the affidavits of jurors themselves to impeach their verdict, inasmuch as the jurors, *without oath*, have given information which is not admissible on their own statement *under oath*.

The affidavits of Mr. Smith and Mr. Kimball, with that of Mr. Holstein, are then pertinent only on the point that, during the trial, a juror took up and examined the piece of the skull of the murdered man, which was on the District Attorney's table. This was (even if the juror be wrong as to the time) after the testimony for the People was rested, and at the time the adjournment was had at the request of the prisoner's counsel, and *before* going into the defence. Even had it not been known to the prisoner's counsel, it was, in the state of the proof, of no manner of consequence; for the uncontradicted evidence (and evidence which was not thereafter even called in question), was that the death was caused by this blow rendering the deceased insensible, so that in the water he was incapable of helping himself, and was drowned; and that the wound was made by a blow with some blunt instrument. And no extent of a juror's examination could have helped him to a different conclusion. Another complete answer to the point, is that, as the fact of the juror's taking up that bone was well known to the prisoner's counsel before they entered on the defence, they had full opportunity for producing, and (in the act) notice to produce on that point—proof as to the nature

and consequences of the wound—any evidence they saw fit, as well as full opportunity to comment in argument on the juror's act, and ask the court to make suitable comment thereon. In no view of it is this ground for a new trial.

As to the presence of the constables in the jury room, I acquiesce in the opinion given by Judge Harris in the Hartung case. At the same time, I should hope that jury rooms will be so arranged that the constables may have a convenient and suitable place for remaining in *by themselves*, when in charge of a jury in any case, civil or criminal.

The remaining ground on which a new trial is asked, is that a constable, at the request of a juror, handed to that juror a paper on which were marked the punishments fixed by law for the different degrees of manslaughter. The affidavits of the jurors as to this point, I was at first disposed to admit to this extent only : That such a paper was handed to a juror before the verdict was agreed upon. The comments and delibera-tions of the jury, whether referring to that or any point in the case, come clearly within the rule that jurors are not allowed to make affidavits to impeach their own verdicts. And I know of no sounder rule of the law. Any other rule would permit a juror, whose conscience, bound by his oath, would not allow him to refuse his assent to a verdict, to commit or procure an irregularity that would, on his own affidavit thereof, avoid the verdict. It would open the door for such mischiefs as could not be endured. I have said I was at first disposed to admit parts of these jurors' affidavits. But, upon reflection, I am satisfied that they should be entirely excluded, as they go to show an act done at the request of a juror, and so to set up the act of their own body, to impeach their verdict, and so are open to the full force of my last position.

The affidavit of Simpson, the constable, is that this paper was handed to the juror before the jury came into court for further instructions. And the position of the case would seem conclusive, that the constable must be correct as to the. time, though he differs as to that from the two jurors. The further instructions had been so entirely clear and explicit, that it was

Wilson v. The People.

not even claimed by the prisoner, that if convicted of the homicide at all, the conviction could be anything but murder, or manslaughter in the *third* degree; that there was no pretence that the offence was either the first or second degree of manslaughter. And, after so explicit a direction, acquiesced in by the prisoner's counsel, it can hardly be that any jury would ask information as to the punishment for the first and second degrees.

Taking this to be so, how is it probable or even possible that the prisoner was prejudiced by information that the statutes fixed imprisonment in the State Prison from two to four years as the punishment for manslaughter in the third degree, and that information given prior to their coming into court for instructions, where they might have asked any and all questions they saw fit, on any point pertaining to the case. I confess that the only construction I am able to give their act, in asking for the information, is that it was an attempt to evade the duty that they felt bearing upon their consciences— the duty of saying that they felt satisfied that the killing was done by the prisoner, and that he had not shown any circumstances to reduce that killing below the grade of murder.

The act was, unquestionably, an irregularity. It was an attempt to do what a jury has no legal right to do—to render a verdict based on the punishment, not on the truth. But the attempt could have been only in favor of the prisoner. I cannot see how it is possible that the verdict rendered was in any way produced by the information. I am, however, unwilling to lose this opportunity of saying, that if jurors cannot learn that they are under oath to "*render a true verdict, according to the evidence,*" and that they are *absolutely bound* to take the *law from the court, and leave to the law the consequences* of a *true* verdict, the sooner we are rid of the privilege of trial by jury, the better for the community.

A new trial cannot be granted.

At the conclusion of the reading of the opinion, District Attorney Courtney moved for sentence.

Mr. Kimball inquired of Judge Gould whether there could be an appeal from this decision.

Judge Gould replied that he did not understand that there could be.

Mr. Kimball then remarked that the prisoner's counsel had prepared a bill of exceptions, which had not been served, as yet.

Judge Gould responded, that the sentence being pronounced would not prejudice the interests of the prisoner in, that respect, and proceeded to pronounce the following sentence:

*Judge Gould*—"Wilson, have you anything to say why the sentence of the law should not be pronounced against you?"

*Wilson*—"All I have to say is, that I have been convicted by perjured witnesses. I am a stranger in this city, and have no friends to help me. I am sure I am innocent of the charge. This is all I have to say."

*Judge Gould*—"I am sorry to say the statement you make is hardly reconcilable with the proof in this case. According to the evidence, the court is perfectly satisfied that the case was one in which the jury could not help rendering the verdict they did. Certain circumstances, proved by all the witnesses, show that you were found in a position where you must have been the only person that could inflict the injury. That he was killed by some one, there is not a reasonable shadow of doubt. That you were the only person in the position to have committed the deed, there is no doubt. Immediately after the act had been committed, you stated that the man had fallen overboard and drowned. You stated what was not true. This fact, and the evidence in the case, together with the finding of the dead body, will lead any intelligent mind to the irresistible conclusion that you did the deed. The testimony of the witness who saw you strike the blow is unimpeached. You knew all about him, and had the opportunity to have impeached his evidence, if you could have done so. That witness swears positively that he saw you strike the blow, and I cannot see how the jury could have come to a different conclusion. The verdict fully satisfies the court. Your statement is altogether

incomprehensible.  Witnesses stood by you during the commission of the terrible act.  A hundred of these acts are repeatedly happening all around us in this community; and during the session of this very court, another most terrible crime has been perpetrated in this county.  As long as pardons shall be granted, to prevent the due execution of the penalty of crime, we shall be subjected to such events.  The only way to make community safe, and to preserve human life, is to have it understood that the penalty of the law will be enforced.

"Your motive we do not know.  That is between you and your own conscience.  The law is not obliged to find a motive when there is a fact established.

"It becomes you, in your awful position, to consider that your fate is sealed.  Your death is determined.  I can see no reason to suppose there should be any sort of interposition in your behalf, and that should be the light in which you should view it.  You should understand that the period of your life is fixed, and allow no hopes to keep you from preparing for the life to come.  You gave no opportunity to your victim to prepare for death.  To you the law is more merciful.  Your future destiny rests between you and your God, and it now remains with you to make your peace with him.

"The sentence of the court is, that you be remanded to jail, and there confined until the 27th of April next, and on that day, between the hours of 10 o'clock in the morning and 2 o'clock in the afternoon, you be hung by the neck until you be dead!  And may God in his infinite wisdom, grant to your soul the blessings he only can give."

A writ of error having been afterwards allowed by Mr. Justice Harris with a stay of proceedings, the cause was removed into this court by writ of error.

*Henry Smith*, for the prisoner.

I. The judge erred in each of the first three propositions in the charge, to which exceptions were taken.

1. The language employed entirely ignores the true criterion of the crime of murder, *the intent to kill.* The effect of the language is, that if one push another from the dock, no matter whether unintentionally or with the most innocent and harmless purpose, and he is drowned, it is murder, unless the defendant can prove that he *did not* intend to take life.

2. No such inference could arise against the prisoner, unless the drowning was such a natural consequence of the pushing as would warrant the conclusion that the prisoner knew what would be the result of his act. (*The People* v. *Hammill*, 2 *Park. Cr. R.*, 227 ; *The People* v. *Rector*, 19 *Wend.*, 591.)

3. The charge proceeds upon the idea that the homicide is *per se* criminal, that if the destruction of McCarty's life resulted from the act of the prisoner, it is murder, unless explained, &c. This ruling shifted the burden of proof, and relieved the prosecution from the necessity of convincing the jury, *beyond a reasonable doubt,* of the intent to take life, the existence of which was just as necessary for the prosecution to establish, and which is as much of the essence of the crime as the killing. (*The People* v. *McCann*, 16 *N. Y. R.*, 66 ; *Com.* v. *Hawkins*, 3 *Gray*, 463.)

4. The purport of the whole charge was that the jury need only determine, in order to find the verdict they did, that the prisoner pushed McCarty into the canal, and that he drowned, which cannot be correct, unless it is true that *every killing*, not explained by the defendant, is *per se* murder.

II. The judge erred in charging, as to manslaughter, that the "heat of passion" means a quarrel, an altercation, *in which the party killed is immediately concerned.*

If there actually exists that "heat of passion" contemplated by the statute, it is absurd to say that it does not palliate the offence, if the accused should, while thus excited, kill some other than the one engaged in the altercation with him. (3 *Jacob, L. D.*, 329, *and cases cited ; Whar. Am. Cr. Law*, 36, 37.)

III. The court also erred in charging, upon the same subject, "that the heat of passion must not all be on one side."

Wilson *v.* The People.

The test the statute makes, is as to the "heat of passion" of the *accused.* Since *he* may be as severely injured, and his passions as much excited by the acts of one who is entirely cool and deliberate, there can be no reason for a rule that de- prives the accused of the right of urging that he is only guilty of manslaughter, merely because his adversary was *not* in a heat of passion. (*Whar. Am. Cr. L.,* 370.)

IV. The judge erred in charging, "It is questionable whether words even of the most aggravated character would be allowed in law to produce the 'heat of passion' meant by the statute, which would reduce the grade of the offence."

This rule would entirely ignore the statute as to man- slaughter, for if the accused must show a combat under suf- ficient provocation, then he makes out a case of excusable homicide.

V. The court erred in allowing the witnesses Witbeck and McLean to be asked what instrument, in their opinion, the wound was caused by.

1. The question assumed that the wound was caused by *an instrument.*

2. As it is manifest that a great variety of weapons would produce such an injury as was found on deceased's head, the question did not call for the opinion of the witness as an expert, but merely to make a guess.

*S. G. Courtney* (District Attorney), for the People.

I. The court properly admitted the evidence of Doctor Wit- beck and McLean. The indictment contains various counts, in which the killing is respectively charged to have been done with an ax, hatchet or bar of iron, and by such striking and casting the deceased into the water, the deceased was drowned.

It was proper to show by scientific men (especially, as in this case, by those who made the *post-mortem* examination), the in- strument in their opinion used, because,

1st. The kind of instrument used was a material element in showing malice aforethought.

2d. And because it was part of the defence that the deceased received the injury in falling against the boat, as he was precipitated into the water.

This kind of evidence is always admitted. (*State* v. *Smith,* 32 *Maine R.,* 369; *Lush* v. *McDaniel,* 14 *Ired.,* 500; *Com.* v. *Rogers,* 7 *Met.,* 485; *Jones* v. *White,* 11 *Humph.,* 268; *Burnett's Com. L.,* 458; *People* v. *Sullivan,* 3 *Seld.,* 398; *Lake* v. *People,* 1 *Park. Cr. R.; People* v. *Clark,* 3 *Seld.,* 391; *Phil. on Ev.,* last ed. by *Edw.,* vol. 2, *p.* 778, &c.)

3d. Even were the rulings of the court unsustained by precedents, this kind of evidence, under the circumstances attending the trial, was properly admitted for the information of the jury.

The prosecution offered in evidence the skull of the deceased on which the wound inflicted, so that the jury might inspect it, which offer was objected to by the prisoner's counsel, on the ground that it was immaterial, and might tend to prejudice the defendant. The court sustained the objection, and afterwards admitted evidence of experts—the surgeons and physicians who made the *post-mortem* examination.

II- The only exceptions remaining are those taken to the charge of the presiding judge.

The parts excepted to were given in illustrating the distinction between the different degrees of homicide. In the illustrations given there was no error; but they were made in conformity with the defined and well settled principles on the subject. The court had expressly defined to the jury the legal meaning of *murder,* and in connection therewith stated the illustrations.

The essence of the crime of murder is *the* intent to kill. Can there be any doubt but that the supposed case could be one of *murder,* unless the circumstances or evidence explained away the intent to kill—*i. e., the crime of murder.*

" The rule of law is, that a man shall be taken to *intend* that which he does, or which is the immediate or necessary consequences of his act." (1 *Russ. on Cr.,* 483; *Com.* v. *York,* 9 *Met.,* 93, *and cases there cited; Com.* v. *Rogers,* 7 *Met.,* 500.)

III. No *words* or gestures, however false or malicious, provoking or insulting, aggravated with the most provoking circumstances, will free the party killing from the guilt of murder. (1 *Hawk. P. C.*, 98, § 33; *Beauchamp* v. *State*, 6 *Black.* [*Ia.*], 299; *State* v. *Barfield*, 8 *Ired.*, 344; *State* v. *Scott*, 4 *Ired.*, 409; *Lord Morley's case*, *J. Kel.*, 53, 55, 65; *State* v. *Merrill*, 2 *Deveraux*, 269; *Com.* v. *York*, 9 *Met.*, 93; 1 *Russ. on Cr.*, 514, *and cases there cited; U. S.* v. *Willberger*, 3 *Wash. C. C.*, 515; *State* v. *Hill*, 4 *Dev. & Dat.*, 491, 497.)

IV. Malice in murder, is malice aforethought. There is no particular time during which it is necessary the prisoner should have contemplated the homicide. If the intent to kill, or to do other great bodily harm, is executed the *instant* it springs in the mind, the offence is as truly *murder* as if it had dwelt there for a longer period. *People* v. *Clark*, 3 *Seld.*, 385; *Meecham* v. *State*, 11 *Geo.*, 615; *Green* v. *State*, 13 *Mo.*, 382; *U. S.* v. *Cornell*, 2 *Mason*, 60, 91; 1 *Russ. on Cr.*, 483, &c.)

V. Whenever a blow is inflicted under circumstances to render the party inflicting it criminally responsible if death follows, he will be holden for murder or manslaughter, though the person beaten would have died from other causes, or would not have died from this one, had not others operated with it, provided the blow contributed mediately or immediately to the death, as it actually took place in a degree sufficient for the law's notice. (*Bishop Cr. L.*, vol. 2, §§ 653, 595; *Greenl. Ev.*, vol. 3.)

VI. The heat of passion, as explained by the presiding judge, was correctly stated, and the general rule is this: Words added to an *assault* upon the prisoner, may perhaps suffice, when the assault would not alone, and that if the *parties* become excited by words, and one of them, acting under the excitement provoked by words, attempt to chastise the other with a *weapon not deadly*, he may be held for manslaughter, though unfortunately death not intended is inflicted. (*Greenl. Ev.*, § 124; *Reg.* v. *Sherwood*, 1 *Car. & K.*, 536; *Bishop Cr. L.*, vol. 2, § 636.)

VII. The intentional killing of a human being, without provocation, and not in a sudden combat, is *murder*, although done in the heat of passion. (*People* v. *Sullivan*, 3 *Seld.*, 396.)

VIII. In the case at bar there is nothing showing legal provocation, mutual combat or heat of passion. All these elements tending to reduce the grade of the offence are wanting, and the facts in the case all warrant the verdict.

IX. The jury having found that the intention to take life existed at the time the prisoner struck the blow, the only question before the court is, did that intention, existing at the instant of striking the blow, form such a premeditated design as contemplated within the meaning of the statute. (*People* v. *Clark*, 3 *Seld.*, 385.)

X. A verdict will not be set aside on a bill of exceptions, although there was error in the trial, if the error was such *that it could do no legal injury*, and the rule in this respect is the same in criminal as in civil cases. And the rule is applied in a capital case, where there was an error in the charge to the jury respecting the law of homicide, when the facts of the case do not call for a charge on the point. (*Shorter* v. *The People*, 2 *Comst.*, 193.)

WRIGHT, J.    The death of McCarty was caused by drowning. It was the indirect result of the act of the prisoner Wilson. The blow inflicted would not have produced death, but it caused temporary insensibility, and when McCarty fell, or was knocked into the canal by its force, he was unable to help himself, and was drowned. The questions on the trial were: 1st. Was Wilson guilty of any offence; and 2d. If so, was it murder or manslaughter in one of the degrees defined by statute? These were questions for the jury, under proper instructions from the court.

It appears from the bill of exceptions, that the presiding judge prefaced his charge to the jury by the statement that it was not claimed by the prisoner's counsel that the defendant could be convicted either of manslaughter in the first or second

degrees, but that if he was guilty of any crime, it was either murder, or manslaughter in the third degree.

It is undoubtedly true, that there was nothing in the circumstances under which the death was effected, to bring the case within the statute definitions of manslaughter in the first or second degrees, unless it be assumed that the sixth section of the statute defining manslaughter in the first degree, is applicable to a case where a party causing death without design, is engaged in an assault and battery. Some judges have taken this position, whilst others have held that, in order to bring a case within the definition of manslaughter in the first degree, it is necessary to show that the accused was committing, or attempting to commit, some other offence than that of intentional violence upon the person killed. (*Darry* v. *The People*, 2 *Park. Cr. R.*, 634; *The People* v. *Butler*, 3 *Id.*, 377; *The People* v. *Rector*, 19 *Wend.*, 605.) But was the proposition that, if the prisoner was guilty of any crime, it was either murder or manslaughter in the third degree, strictly correct? Of this I entertain serious doubt. The statute defines what shall be murder, and also *four* degrees of manslaughter. It also declares what shall be justifiable or excusable homicide. Manslaughter in the third degree is the killing of another in the heat of passion, without the design to effect death, by a dangerous weapon, in any case except such wherein the killing is declared to be justifiable or excusable.

In the fourth degree, it is defined to be the involuntary killing of another by any weapon, or by means neither cruel nor unusual, in the heat of passion, in any other cases than such as are declared by the statute to be excusable homicide. After defining murder, justifiable and excusable homicide, and the four degrees of manslaughter, it is provided that " every other killing of a human being, by the act, procurement or culpable negligence of another, where such killing is not justifiable or excusable, or is not declared in this chapter murder, or in this title manslaughter of some other degree, shall be deemed manslaughter in the fourth degree. (2 *R. S.*, 662, § 19.)

Now this was not a case of murder, unless the killing was perpetrated from a permeditated design to effect the death of McCarty. It was not a case of manslaughter in the first or second degrees. Nor was it manslaughter in the third degree, unless the killing was in the heat of passion, and without a design to effect death, and by a dangerous weapon. For the case to have fallen within this degree, it was not enough that the killing was in the heat of passion, and without the design to effect death, but it must also have been by a dangerous weapon. If the killing was not effected by the use of a dangerous weapon, though the heat of passion existed, and there was the absence of design to effect death, it would not be manslaughter in the third degree. But if the killing was in the heat of passion, and without the design to effect death, but not by the use of a dangerous weapon, I see not why a conviction might not properly be had of manslaughter in the fourth degree ; and if so, the instruction that Wilson, if guilty of any crime, it was either murder or manslaughter in the third degree, was erroneous. I use the term *instruction*, for what the judge said to the jury was in the nature of an instruction, whilst directing their attention to the statutory definitions of murder and manslaughter in the different degrees, and interpreting those provisions. But the prisoner's counsel appear to have been satisfied with this branch of the charge, and took no exception.

It is now well settled that, under our statutes, to constitute the offence of murder, there must be a premeditated design to effect the death of the person killed, or, in other words, an intention to kill. The design may be long meditated, or it may be conceived at the moment the fatal blow is given ; but it must be found to exist, else it is not murder. There must be, what the common law did not require, the existence of an actual intention to kill. In this case, unless Wilson, when he pushed or knocked McCarty overboard from the canal boat, precipitating him into the water, formed the design, at the instant, to kill the latter, it was not murder. Such intention may be inferred from the circumstances under which the violence is inflicted, and sometimes from the act itself, for men are

Wilson *v.* The People.

to be presumed to intend the natural and inevitable conse-
quences of the acts which they willfully perform; but unless
there be such an *intention,* the act cannot be more than man-
slaughter. The effect of our statute is to explode the whole
common law doctrine of implied malice and the power of
recent provocation, to reduce the act from murder to man-
slaughter. In the absence of the intent to kill, the act must
be justifiable or excusable homicide or manslaughter, within
some one of the degrees defined by statute. Was the judge
therefore correct, whilst speaking of the blow inflicted by Wil-
son, in instructing the jury that, if the natural consequences
of a blow is to precipitate a man into the water, and he drown,
such act is murder, unless explained away by evidence or cir-
cumstances attending the transaction? Or was he correct in
the charge, "That should a man stand on the edge of a dock,
and another push him into the river, the pusher is not entitled
to say to the other, you must swim; if he be drowned, such
act is murder, unless explained away by evidence of the cir-
cumstances attending the transaction, for the law presumes that
a man intends the consequences of his acts, unless otherwise
explained?" Either of the cases put to the jury would, at
common law, have been *prima facie* murder, for malice would
have been implied from the act itself, and the burden of proof
to explain or reduce the grade of the offence to manslaughter
would have been shifted upon the accused. But under our
statutes, another ingredient was wanting to constitute the crime
of murder, viz.: an actual intention, by the infliction of the
blow, or the push into the water, to kill. It is true that the
jury would be at liberty to infer this intention in a proper
case from the act itself, upon the salutary rule of the common
law, that a man is held to intend that which, in the ordinary
course of things, would be the natural result of his acts; but
no legal implication of a felonious intention can now arise, so
as to throw upon the accused the burden of explaining the
innocence of the transaction, or reducing the offence to man-
slaughter. It seems apparent to me that the learned judge had
in view the common law rule, that in every homicide by vio-

lence, the law implies malice, so as to make it *prima facie* criminal, throwing the *onus* of explanation on the accused; else what is meant by the language, "Unless explained away by evidence or circumstances attending the transaction?" "If," says the judge, "the natural consequences of a blow is to precipitate the man into the water, and he drown, it is murder, unless explained away by evidence," &c. How explained away, and by whom? Certainly, by the prisoner. "To strike a blow, the natural consequence of which is to precipitate another into the water, and that other drown, it is murder." This is the instruction. Why, unless it be that the law implies malice, and an actual intention to kill need not exist. It is virtually saying that it is not incumbent upon the prosecution to satisfy the jury of a conceived design to effect death by the person inflicting the blow, before there can be a conviction for murder; but that the act of inflicting a blow under circumstances that will necessarily precipitate the person into the water, and he drown, is sufficient *prima facie* (the law inferring that the act was malicious), to establish guilt. It seems to me, that, taking the charge together, it proceeded upon the idea that the homicide was *per se* criminal, and that if the destruction of McCarty's life resulted from the act of the prisoner, it was murder, unless explained away by proof on the part of the prisoner. This ruling shifted the burden of proof, and relieved the prosecution from the necessity of satisfying the jury of the intent to take life, the existence of which fact it was just as necessary for the prosecution to establish, and which was as much of the essence of the crime, as the killing. Should it be said that the illustrations given of what would be murder, were not applicable to the facts of the case, and are therefore to be treated as mere abstract propositions, it is not difficult to perceive that they were calculated to mislead the jury. The circumstances under which McCarty was drowned were few and simple. He and Wilson were hands on board of boats navigating the canals of the State. McCarty's boat, with two others, were lying in the canal, near the railroad bridge, at West Troy. About 3 o'clock in the morning, the

boat on which Wilson was employed arrived from Buffalo, and came too along side of one of the boats. Whilst they were engaged in securing and managing her lines, an altercation arose between Wilson and McCarty. Whether they had ever met before does not appear, but abusive words passed between them, and threats of fighting. McCarty was near the stern or side of his boat, when Wilson stepped upon her deck. As the latter approached McCarty, he picked up from the deck a blunt instrument and inflicted a blow with it upon the head of McCarty. The latter was so near the side of his boat that, being stunned by the blow, he fell into the water of the canal, or the force of the blow precipitated him into the water. Wilson dropped the weapon on the boat, and took a pole and attempted to get the body out of the water, but failing, called to the men of the other boats. The blow producing a concussion of the brain, rendering him insensible, McCarty could do nothing to extricate himself from the water, and he drowned.

Now, that the destruction of the life of McCarty resulted from the act of Wilson was manifest, but certain it is that it was not murder, unless at the time of striking the blow he designed to kill him. This was a controlling question in the case in characterizing the act as murder, and it was a fact that the jury must find before a conviction could legally be had. Indeed, in my view, it was the principal question. The jury might have found the actual intention to kill, from the circumstances attending the act, or inferred it from the act itself, if a murderous weapon was used, or the blow was inflicted in a dangerous place, or the natural and inevitable consequences of such blow was to produce insensibility, and from McCarty's position on the boat to precipitate him into the water in that state. But instead of saying to the jury that they must find the actual intention to kill at the time of inflicting the blow which precipitated McCarty into the water, before they could convict of murder. I cannot but think that the charge of the judge was calculated to mislead them, if nothing more, by the abstract propositions (if they are to be so called), enunciated in this part of it. But the judge did not intend them as abstract

propositions.   He was speaking of the case in hand when he told the jury that pushing a man into the water, if he were standing on the edge of a dock, or that if the natural consequences of a blow be to precipitate the man struck into the water, and he drown, the acts were murder.   The jury must naturally have understood from the charge, that in order to find the verdict that they did, they need only determine that the prisoner pushed or knocked McCarty into the water, and that he drowned.   This would be ignoring the true criterion of the crime of murder, *the intent to kill*, and cannot be correct unless it is true that every killing, not explained by the defendant, is *per se* murder.

In the judge's explanation to the jury of the statutory offence of manslaughter in the third degree, he stated "that the 'heat of passion' means a quarrel—an altercation in which the party killed is immediately concerned; that is, the 'heat of passion' must not be all on one side; there must be sufficient cause for it."   And again, after the jury had returned into court, and inquired whether they could find a verdict in any other form than guilty or not guilty, the presiding judge further charged, among other things, in these words: "It is questionable whether words even of the most aggravated character would be allowed to produce the heat of passion meant by the statute, which would reduce the grade of the offence." The idea sought by the judge to be conveyed to the jury in his explanation of the term "heat of passion," in his first charge, probably was, that if in a paroxysm of unprovoked anger one kill another, or instigated by brutal passion, not excited by such other, the assailant kills his victim, it is not that "heat of passion" which forms one of the statutory elements of manslaughter.   As a principle, this was undoubtedly correct.   If the intention to kill exists, it is not the less murder that the killing occurred under the excitement of unprovoked and brutal passion.   I cannot but think, however, that the judge was unfortunate in the use of terms to convey the idea to the jury.   Is it always necessary to the existence of that "heat of passion" contemplated by the statute, that there

Wilson *v.* The People.

should be a quarrel or altercation in which the party killed is immediately concerned? I think not. If the contemplated "heat of passion" actually exists, it would palliate the offence, if the accused should, whilst thus excited, kill some other than the one engaged in the altercation with him. Again, said the judge, "the heat of passion must not be all on one side; there must be sufficient cause for it." Now, would not the jury from this probably understand that the statute "heat of passion" could not exist where there was no manifestation of excitement or passion on the side of the party assailed? Such a view would certainly be a mistaken one. The test which the statute makes, is as to the "heat of passion" of the accused. He may be severely injured, and his passions excited by the *acts* of one who is entirely cool and deliberate. Again, what was meant by the expression, "There must be sufficient cause for ' the heat of passion?'" Or, rather, what would the jury probably understand by it? Why, that there must be sufficient in the conduct of. the party assailed to provoke :and heat the passions of the assailant. What conduct would be sufficient, was not explained. Whether an assault, or words alone, or words added to an assault. Subsequently, however, the judge instructed the jury substantially, that the use of words alone, even of the most aggravated character, would not be allowed in law to produce the heat of passion meant by the statute, which would reduce the grade of the offence; that is, that an excited or heated passion, provoked by words alone, even of the most aggravated character, is not that "heat of passion" meant by the statute in defining the offence of manslaughter. This was virtually saying to the jury that in no case where a party, acting under an excitement provoked by words alone, assaults another, and death, not intended, is the result of the assault, can the offence be reduced to manslaughter. In the prisoner's case there was no pretence that in making the assault upon McCarty he was acting under any other excitement than that provoked by words; and this declaration of the law was equivalent to saying to the jury that they could not find the prisoner guilty of manslaughter in the third degree, even

though the killing was by a dangerous weapon, and unintentional. Was the law, therefore, in this respect correctly expounded? I think not. The law, respecting the infirmities of our nature, attaches a less degree of criminality to acts of violence perpetrated under an excitement provoked by the assailed. The passions may be heated as effectually by words as by acts; and an assault may be provoked oftentimes as readily by the former as the latter. In cases of assault of the person, it has always been held that provocation by words has gone far to mitigate the legal wrong. It cannot be that the accused must always show a combat and a sufficient provocation. It is enough that the passions are heated by the acts or conduct of the one upon whom the assault is made, and it matters not whether this state is produced by acts or words, if either the one or the other are naturally calculated to produce it. It is conceded, in the points of the counsel for the People (what is undoubtedly the law), that if parties become excited by words, and one of them, acting under the excitement provoked by words, attempt to chastise the other with a weapon not deadly, he may be held for manslaughter, though death, not intended, is inflicted. This could not be, if the law would not allow, as the judge charged, " the heat of passion " meant by the statute to be produced or provoked by " words even of the most aggravated character."

Upon the trial, the coroner, who was a physician, and who had held the inquest and made the *post-mortem* examination, was called as a witness. He described with particularity the wound discovered on the right side of the head of McCarty, and expressed the opinion that only one blow was given, and that blow produced concussion of the brain, causing insensibility. He expressed the further. opinion that McCarty was by the blow rendered insensible so that he could not help himself, and he drowned in the water of the canal. The prosecution then put to him the following question: From your examination of the wound that you have described, what kind of an instrument. was it caused by, in your opinion? This question was objected to as not being the subject matter

of an opinion; but the objection was overruled by the court, and the witness answered: "That wound, in my opinion, was caused by a blow from some blunt instrument."

The same question was put to another physician who assisted in the *post-mortem* examination, the same objection taken and overruled, and his answer was, "I think it was caused by some blunt instrument like the head of an axe or hammer." I am not satisfied that the court ruled correctly in this respect, and I think it would be difficult to sustain the ruling upon principle. The kind of instrument used was of course a material element in showing malice aforethought; but the question here is, was the evidence admitted to show it legal and competent? Whether any, and what kind of instrument was used, was a fact for the jury to find. Physicians are allowed to express opinions on matters pertaining to their particular science or profession, for the reason that, from the nature of the subject, facts disconnected from such opinions cannot be so presented to a jury as to enable them to pass upon the question with the requisite knowledge and judgment. On a subject not of science or skill, or involving no peculiar experience or knowledge, opinions of witnesses are inadmissible. To answer properly whether the wound discovered on McCarty's head was produced by a sharp or blunt weapon, required no peculiar scientific knowledge; and after the physicians had described minutely the character of the wound and the indentation of the skull bone, and expressed the opinion that concussion of the brain was produced by the blow, the jury were just as competent as these professional *experts* to find or *guess* what kind of a weapon caused the skull bone to be pressed in as described, and whether it was *blunt* or otherwise. It is obvious that a great variety of weapons would produce such an injury as was found on the head of the deceased; and if there was to be any *guessing* on the subject, the jury, and not the witness, was alone competent to do it. From the description given of the wound, it was just as manifest to the jury as to the witness that it was caused by some blunt and not sharp weapon. But this was not the purpose of the inquiry. That

purpose was to get these *experts* to express an opinion as to the particular instrument with which the blow was inflicted. This was accomplished by the reply of the second witness, that he thought the wound was caused by some blunt instrument, *like the head of an axe or hammer*. In the absence of any weapon identified as being used by the prisoner, the theory of the prosecution that the weapon was an axe or hatchet, or hammer, was sought to be sustained not by the proof of facts tending to show the particular kind of instrument used, but by the opinions of witnesses. These witnesses were *experts* in matters pertaining particularly to their profession, and as such were permitted to express opinions; but when the question was one not of skill, and it was obvious that the jury were quite as competent as themselves to determine the question, such opinions were inadmissible. These scientific witnesses were certainly not better able to judge of the peculiar kind of blunt instrument that pressed in the skull of the deceased, the thickness of the bone, than the jury. Their skill did not enable them to say whether it was an axe or hammer, or any other weapon. All that they could say was, that a blunt substance of the dimension of the wound had been applied to McCarty's skull with sufficient force to press in the skull the thickness of the bone. This the jury was just as competent to determine as the witnesses, and the prisoner was entitled to the opinion of the jury, and not the witnesses, whether the instrument used was an axe or hammer, or other dangerous weapon.

I am of the opinion that there should be a new trial. One thing is quite manifest, that the prisoner did not intend to destroy the life of McCarty by drowning him; but when he struck the blow that cast the latter into the water, if the design existed to effect death, it would be murder. If the killing was not actually intended, it could be but manslaughter.

The prisoner was entitled to have this question of intent distinctly presented to the jury; and if, from the evidence, they found it to have existed at the time of raising the weapon and striking the blow, they might properly convict him of the higher offence. So also, if the jury found that under

an excitement growing out of a quarrel or altercation with the deceased, the assault was made with a dangerous weapon, but without the formed design of effecting death, the only proper conviction would be for manslaughter.

The judgment of the Oyer and Terminer should be reversed, .and a new trial ordered.

*Hogeboom, J.*, concurred; *Gould, J.*, dissented.

Judgment reversed.

